**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

|  |  |
|---|---|
| Edgardo R. Valdez, | No. CV-04-1620-PHX-JAT |
| Plaintiff, | **ORDER** |
| vs. | |
| Big O Tires, Inc., a Nevada corporation; JDR, LLC, an Arizona limited liability company, | |
| Defendants. | |

Pending before the Court is the Defendants' Motion for Summary Judgment (doc. 19). The Court now rules on the motion.

I.     INTRODUCTION

The Plaintiff in this case, Edgardo Valdez, is a Mexican American who was employed by JDR, L.L.C. ("JDR"). Pursuant to a franchise agreement, JDR uses the trade name "Big O Tires."

On August 6, 2004, the Plaintiff filed a Complaint against JDR and Big O Tires in the United States District Court for the District of Arizona alleging causes of action arising under Title VII, 42 U.S.C.A. 2000(e) (West 2003), and 42 U.S.C.A. § 1981 (West 2003). Specifically, the Plaintiff alleges that the Defendants subjected him to a racially-hostile work environment and retaliated against him when he complained about the harassment. The Plaintiff alleges that these events ultimately resulted in his resignation. The Complaint alleges

1 a federal question and the basis for this Court's jurisdiction is 28 U.S.C.A. § 1331 (West 1993).

## II.     LEGAL ANALYSIS AND CONCLUSION

The standard for summary judgment is set forth in Rule 56(c) of the Federal Rules of Civil Procedure.  Under this rule, summary judgment is properly granted when: (1) no genuine issues of material fact remain; and (2) after viewing the evidence most favorably to the non-moving party, the movant is clearly entitled to prevail as a matter of law.  Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23, 106 S.Ct. 2548, 2552-53 (1986); *Eisenberg v. Ins. Co. of N. Am.,* 815 F.2d 1285, 1288-89 (9th Cir. 1987).

The Defendants argue that they are entitled to judgment as a matter of law because: (1) Big O Tires is not liable for the acts of JDR's employees; (2) the Plaintiff has failed to alleged facts amounting to a constructive discharge; (3) the Plaintiff has failed to allege facts sufficient to support a hostile-work-environment claim; and (4) the Plaintiff has failed to allege facts sufficient to support a retaliation claim.

### A.     Liability of Big O Tires

The Defendants argue that Big O Tires is merely a trade name used by Defendant JDR, pursuant to a franchise agreement between the Defendants.  The Defendants argue that JDR uses the trade name Big O Tires but does not do business as Big O Tires.  The Defendants also argue that Big O Tires, which is a Nevada corporation, and JDR, which is an Arizona limited liability company, are entirely separate and unrelated legal entities.  They argue that Big O Tires does not have any responsibility for JDR's employment practices or decisions.  The Defendants argue that, given the above factual allegations, Big O Tires cannot be held liable for the alleged discriminatory acts of JDR's employees.

The Court agrees that Big O Tires cannot be liable to the Plaintiff for the claims alleged in his Complaint unless the Plaintiff can show some facts suggesting the existence of some type of employment relationship between Big O Tires and the Plaintiff, or an agency relationship between JDR and Big O Tires.  *See, e.g., E.E.O.C. v. Pacific Maritime Ass'n,* 351 F.3d 1270, 1273 (9th Cir. 2003).  However, the Plaintiff completely failed in his

- 2 -

Response in Opposition to the Defendants' Motion for Summary Judgment to present any law, evidence, or even factual allegations contradicting the Defendants' position that no such relationships exist. The Plaintiff conceded at Oral Argument on June 19, 2006, that he does not contest the Defendants' Motion for Summary Judgment as it applies to Defendant Big O Tires.[1]

A party opposing summary judgment cannot merely rest on its pleadings, it must produce some significant probative evidence tending to contradict the moving party's allegations and thereby creating a material question of fact. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256-57, 106 S.Ct. 2505, 2513-14 (1986) (holding that the plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment); *First Nat'l Bank v. Cities Serv. Co.,* 391 U.S. 253, 289, 88 S.Ct. 1575, 1592 (1968). The Plaintiff in this case has completely failed to raise a question of fact as to whether there is a direct or indirect employment relationship between the Plaintiff and Big O Tires, or an agency relationship between JDR and Big O Tires. *See, e.g, Sun-Maid Growers, v. NLRB,* 618 F.2d 56, 59 (9th Cir. 1980) (discussing when a "joint employer" relationship exists); *NLRB v. Don Burgess Constr.,* 596 F.2d 378, 384 (9th Cir. 1979), *cert. denied,* 444 U.S. 940, 100 S.Ct. 293 (1979) (discussing when two business entities can be considered a "single employer"); *see also Evans v. McDonalds Corp.,* 936 F.2d 1087, 1090 (10th Cir. 1991) (even where a franchisor provided training materials and conducted frequent inspections, it did not have control over franchisee's labor relations, and could not considered an employer for purposes of Title VII); *Alberter v. McDonalds Corp.,* 70 F.Supp.2d 1138, 1145 (D. Nev. 1999) (ability to terminate the franchise agreement, without more, does not establish the requisite degree of control to demonstrate that an agency relationship exists for purposes of Title VII liability).

The Defendants' Motion for Summary Judgment is granted with respect to all claims alleged against Defendant Big O Tires.

---

[1] The Plaintiff also conceded that Big O is an incorrect party.

- 3 -

The Court will now address the merits of the Plaintiff's claims as they apply to Defendant JDR.

B.     Hostile Work Environment

The Defendants contend that the Plaintiff has failed to raise a genuine issue of material fact regarding whether the working environment at the Plaintiff's place of employment was hostile and discriminatory or whether the Defendants engaged in a pattern or practice of discriminatory treatment based on race or national origin.

Hostile-work-environment claims based on racial harassment are reviewed under the same standard as those based on sexual harassment. *McGinest v. GTE Service Corp.,* 360 F.3d 1103, 1115 (9th Cir. 2004). The Ninth Circuit has set forth a three-factor test to determine whether a working environment is "hostile" within the meaning of Title VII or section 1981.[2] The plaintiff must show that: (1) he was subjected to verbal or physical conduct based on his membership in a protected class;[3] (2) the conduct was unwelcome; and (3) the conduct was sufficiently severe or pervasive to alter the conditions of his employment and create an abusive working environment. *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 2405 (1986) (sexually-hostile work environment); *Jordan v. Clark,* 847 F.2d 1368, 1373 (9th Cir. 1988) (same).

In order to be actionable under Title VII, the work environment must be both objectively and subjectively offensive: one that a reasonable person would find hostile or abusive, and one that the victim did in fact perceive to be hostile and abusive. *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21-22, 114 S.Ct. 367, 371 (1993) (sexually-hostile work environment); *McGinest,* 360 F.3d at 1113 (racially-hostile work environment). Whether an environment is "hostile" or "abusive" can be determined only by looking at all the

---

[2] The elements of a hostile-work-environment claim are the same under Title VII and section 1981. *See, e.g., Manatt v. Bank of Am.,* 339 F.3d 792, 798 (9th Cir. 2003).

[3] It is undisputed that the Plaintiff, who is Mexican American, is a member of a protected class.

- 4 -

circumstances. *McGinest,* 360 F.3d at 1113. Relevant factors include: (1) the frequency of the discriminatory conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with an employee's work performance. *Harris,* at 21-22, 114 S.Ct. at 371; *McGinest,* 360 F.3d at 1113. The required showing of severity or seriousness of the harassing conduct varies inversely with the pervasiveness or frequency of the conduct. *McGinest,* 360 F.3d at 1113; *Ellison v. Brady,* 924 F.2d 872, 878 (9th Cir. 1991) (sexually-hostile work environment).

For the reasons set forth below, the Court finds that there is a genuine issue of material fact regarding whether the Plaintiff was subjected to a hostile work environment.

The Plaintiff alleges that in approximately June of 2000, Mr. Craig Secia became his direct supervisor. The Plaintiff testified at his deposition that the first time he met Mr. Secia, the supervisor asked him if he was a "sand nigger." The Plaintiff testified that he asked Mr. Secia what he meant, and Mr. Secia responded that "I just don't like sand niggers, period. They bring me misery and bad luck. I don't like them." The Plaintiff testified that he told Mr. Secia that he was Mexican American, and Mr. Secia intentionally "bumped his shoulder" and said, "we are going to get along just fine."

The Plaintiff alleges that over the next seven months, Mr. Secia repeatedly referred to the Plaintiff while he was working as a "wetback," "stupid wetback," "sand nigger," "stupid Mexican," "dumb Mexican," "lazy Mexican," "illegal alien," "spic" and "stupid ass beaner." The Plaintiff alleges that he was told by Mr. Secia that "the only good Mexican is a dead Mexican," and that the supervisor made numerous other racially disparaging remarks about Hispanic, Mexican, and Mexican-America people. The Plaintiff testified at his deposition that Mr. Secia would often physically bump him on the shoulder when he was at the counter.

The Plaintiff testified at his deposition that Mr. Secia told the Plaintiff that he had to "handle" customers who were Mexican or Hispanic because, "these are your stupid, motherfucking people, fucking wetbacks, wetties." The Plaintiff testified that Mr. Secia

- 5 -

called him at home on numerous occasions and left offensive messages on his answering machine. For example, the Plaintiff testified that on one occasion Mr. Secia called and left a message claiming to be from the "IRS and Immigration Recovery System" and stated that they are looking for the Plaintiff because his "green card has expired and we are looking to pick him up."

The Plaintiff testified that he told Mr. Secia directly that he did not appreciate being called a "wetback," but that Mr. Secia responded, "I don't care if you like it or not. You are a wetback. Your parents are from Mexico." The Plaintiff testified that he told Mr. Secia that he served seven years in the United States Army honorably, and Mr. Secia responded, "It doesn't matter. You are a stupid ass beaner wetback. You are just a dumb Mexican as far as I am concerned." The Plaintiff testified that when he did well on the job, Mr. Secia would say things like, "not bad for a Mexican wetback."

In addition to the above conduct and racial slurs that were directed specifically at the Plaintiff and his protected class, the Plaintiff testified that Mr. Secia constantly subjected the Plaintiff to racial epithets and derogatory remarks about other racial groups. For example, the Plaintiff alleges that Mr. Secia referred to African-American people as "niggers," who are "in and out of jail," Chinese people as "chinks," Jewish men as "little Jewboys," Arab people as "sand niggers," and racially-diverse couples as "zebras." The Plaintiff alleges that Mr. Secia told him that he "hated Jews," and that Jewish people are so cheap that he does not like to do business with them, and that they "squeak when they walk."

The Plaintiff testified that if Mr. Secia saw a customer of "Eastern"[4] descent, he would tell the Plaintiff "when he comes in the store, tell him we don't have anything." And that if "they ask for tires, you send them to another store. If he wants an oil change, tell him we are booked. And that is the way I run my ship here. This is the way I am. I don't want them. They are bad luck to me."

---

[4] The Plaintiff defined Eastern to include those individuals that appeared to be "Arab" or "Chinese."

- 6 -

The Plaintiff alleges that Mr. Secia called an African-American gentleman the Plaintiff worked with a "black nigger and that his nickname is midnight; I have always called him midnight." The Plaintiff testified at his deposition that Mr. Secia made racial slurs about African-American gentlemen who worked with the Plaintiff in the presence of Mr. Secia's supervisors. For example, the Plaintiff testified that Mr. Secia told the Plaintiff he called a particular gentleman "midnight" because he is a "black motherfucker" and that "I can say those things." The Plaintiff testified that upon hearing Mr. Secia's comments, Mr. Secia's supervisor, Ron Britton, just "turned red, smiled, and walked away."

The Plaintiff testified that on another occasion, Mr. Secia "mimed hand motions" and stated, "Look at Woodrow. He is moving his hands like an orangutan, like his heritage. That's what he is. He is a monkey. Look at him. That's why he is built like that." The Plaintiff testified that Mr. Secia's supervisors, Doug and Ron Britton, were present and just shook their heads and smiled.

The Plaintiff testified that on a third occasion, an African-American gentleman was late for work and Mr. Secia called him at home. The Plaintiff testified that he overheard Mr. Secia say to the gentleman, "Look here you black nigger motherfucker. Get your ass in here. You are not on nigger time." The Plaintiff testified that Mr. Secia told the gentleman, "You are eating watermelon. Sucker, you come in and go to work right now."

The Plaintiff testified that these types of harassing and discriminatory remarks and incidents occurred at least three times a day over a period of seven months. The Plaintiff testified that often one or both of Mr. Secia's supervisors were on the job site and could hear what Mr. Secia was saying and did not do anything but smile, shake their heads, or walk away. The Plaintiff testified that the racial slurs "turned [his] stomach," and during the period of time that he was subjected to Mr. Secia's conduct the Plaintiff had stomach problems and trouble sleeping.

The Plaintiff alleges that he complained about Mr. Secia's conduct to both of Mr. Secia's supervisors, Ron and Doug Britton, on two separate occasions. The Plaintiff alleges that neither of the supervisors took any corrective measures and in fact told the Plaintiff that

- 7 -

1  he should "just get over it," because Mr. Secia is "just that way." The Plaintiff testified that
2  he told the supervisor that he can "handle Mr. Secia's cussing," and that he can "understand
3  that is just the way he is." But that it bothers him when Mr. Secia tells him things like, "I can
4  get any beaner or wetback from the street and take your place." The Plaintiff alleges that he
5  was told to "just get over it."

6  The Plaintiff testified at his deposition that shortly after he complained about Mr.
7  Secia's conduct, the Plaintiff went back to ask for a pay raise because his wife was about to
8  give birth. The Plaintiff testified that he listed the qualifications he believed entitled him to
9  a raise: (1) he is bilingual; (2) he is an expert salesman and brings in approximately 32
10 percent of the company business; (3) he is good with customers; (4) he is computer literate;
11 (5) he is a hard worker; and (6) he is honest. The Plaintiff testified that the supervisor told
12 him that he would speak to Mr. Secia about the raise. The Plaintiff alleges that he was told
13 by Mr. Secia that he would not get the raise because "I can get any wetback, any guy south
14 of the border. I can train them like you. I could pay them less, less money. I could pay them
15 pennies compared to what you want."

16 The Plaintiff testified that the racist conduct continued and Mr. Secia would say to
17 him on a daily basis, "How are you doing, stupid wetback." If the Plaintiff objected to the
18 comments, Mr. Secia would respond, "I address people that way. If you don't like it so
19 what." The Plaintiff testified that shortly after these events occurred, he went to Doug
20 Britton, and told him that he wanted to make his job a career but that he can't deal with Mr.
21 Secia's conduct. The Plaintiff testified that he told Mr. Britton that he wanted to quit because
22 of the way that he was being treated, and that he wanted to know if anything could be done
23 about Mr. Secia's conduct. He testified that Mr. Britton told him that he didn't want to lose
24 the Plaintiff because he was his "money maker," and that he would see what he could do.
25 The Plaintiff testified that shortly after the conversation, he was given the raise that he had
26 previously asked for, but nothing was done about Mr. Secia's conduct.

27 The Plaintiff testified that following the conversation with Mr. Britton, Mr. Secia told
28 the Plaintiff that he didn't want to give him a raise but that it was the Brittons' decision. Mr.

Secia also told the Plaintiff he hired an installer and the Plaintiff was going to train this person so that the new person could "handle the workload." The Plaintiff testified that the amount of his paychecks are based on sales, and that Mr. Secia hired this other individual to divide up the sales, to retaliate against the Plaintiff for reporting Mr. Secia's conduct to his supervisor.

The Plaintiff alleges that the discriminatory conduct continued and became so intolerable that he was eventually forced to resign. The Plaintiff testified that Mr. Secia continued to tell him on a nearly daily basis that "A good Mexican is a dead Mexican." The Plaintiff also testified that in January of 2001, Mr. Secia called a meeting and asked employees to bring salt and pepper. The Plaintiff testified that Mr. Secia placed salt on one half of a piece of a folded paper, and pepper on the other half. He testified that Mr. Secia asked if anyone knew what the salt and pepper represented. The Plaintiff testified that he asked Mr. Secia if they were really going to have a meeting, and that Mr. Secia responded that if anyone left they would be fired. The Plaintiff testified that Mr. Secia then asked the Plaintiff what he thought the salt-and-pepper demonstration meant. The Plaintiff testified that he responded that it looks like the salt and pepper are separated. Mr. Secia stated, "Yep. That's the black people at the soup line at the Washington One Million Man March, and they are poor and ready to get fed by the superior white man."

The Plaintiff testified that the above incident was Mr. Secia's "last discriminating joke, which is not a joke to [the Plaintiff]," before the Plaintiff left a letter of resignation on January 22, 2001.

The Defendants in this case dispute the Plaintiff's allegations, and argue that the Plaintiff does not have standing to bring a hostile-work-environment claim because most of the remarks alleged were directed at other (non-Mexican, non-Hispanic, and non-Mexican-American) racial groups. They also argue that Mr. Secia's conduct merely amounts to "simple teasing and offhand comments" that do not rise to the level of severity necessary to prove a hostile-work-environment claim.

First, the Court disagrees that the Plaintiff lacks standing to bring a hostile-work-environment claim merely because some of the offensive conduct was directed at other racial minority groups. The Ninth Circuit has held that when racial hostility pervades the workplace, an employee can establish a violation of Title VII even if he was not the direct target of the hostility. *McGinest,* 360 F.3d at 1117. When racial animus motivates a person to make provocative comments in the presence of an individual in order to anger and harass that person, the comments are "highly relevant in evaluating the creation of a hostile work environment," regardless of the identity of the person to whom the comments were directed. *Id.* The fact that racially charged words were not only directed at the Plaintiff and Mexican-American people but were also consistently directed at members of various other racial-minority groups makes the conduct in this case more outrageous, not less so. *See id.*

"No single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as 'nigger' by a supervisor in the presence of his subordinates." *Id.* at 1116 (internal citation and quotations omitted). The Plaintiff's direct supervisor not only repeatedly used that particularly offensive term, but also frequently used racial epithets that are equally offensive to people of Hispanic, Mexican, or Mexican-American heritage. The existence and the severity of discrimination is determined from the perspective of a reasonable person of the plaintiff's race. *Id.* This Court finds that a reasonable jury could find that the constant barrage of racial epithets like the ones allegedly made in this case could be seen by a Mexican-American person as conveying the message that anyone who is not Caucasian is disfavored and is not a full-and-equal member of the workplace.

There is no question that the Plaintiff has succeeded in alleging a pattern of ongoing and persistent racial-based conduct in his workplace. Although many derogatory comments were made about other racial groups, the Plaintiff testified that he was, on a daily basis, subjected to offensive racial slurs about Mexican Americans in general. He testified that many of the offensive comments were directed at him personally. Some of the conduct

1  alleged could even be interpreted as threatening in nature, such as the repeated statement to
2  the Plaintiff that "A good Mexican is a dead Mexican," as well as the supervisor physically
3  bumping the Plaintiff's shoulder while making offensive remarks.

4        The Court can hardly envision a situation where the acts alleged could be more severe
5  or pervasive. The alleged conduct in this case took place three or more times daily over a
6  period of six or seven months. This is not a case of "simple teasing or offhand remarks."
7  The alleged remarks and conduct not only occurred frequently but were of a highly offensive
8  nature. The Plaintiff in this case was surrounded by racial hostility, at his workplace, that
9  was created by his direct supervisor.

10       It is clear from the Plaintiff's deposition testimony that the conduct alleged was
11 unwelcome and that the Plaintiff perceived the work environment to be hostile and abusive.
12 Therefore, the Court finds that the Plaintiff has met his burden of establishing that the work
13 environment was subjectively offensive. Given the highly inflammatory nature of the racial
14 comments, and the frequency in which they occurred, the Court also finds that the Plaintiff
15 has succeeded in establishing a question of fact as to whether the work environment was
16 objectively offensive.

17       The Defendants argue that even assuming the existence of a hostile work environment,
18 the Defendants are still not liable because by resigning, the Plaintiff unreasonably failed to
19 give the Defendants the opportunity to take any preventative or corrective measures.
20 However, the Plaintiff testified at his deposition that not only were Mr. Secia's supervisors
21 present during some of the allegedly discriminatory incidents, the Plaintiff complained
22 directly to the supervisors about Mr. Secia's conduct. The Plaintiff testified that he was
23 given a raise but that the Defendants did nothing to address the actual discriminatory
24 conduct. The Plaintiff testified that after he reported Mr. Secia, the discriminatory conduct
25 continued for another 4 to 5 months before the Plaintiff resigned. Thus, the Court finds that
26 the Plaintiff has succeeded in raising a question of fact as to whether the Defendants, after
27 the Plaintiff reported the discriminatory conduct, failed to take appropriate remedial action.
28

1      Accordingly, the Defendants' Motion for Summary Judgment is denied with respect
2 to the hostile-work-environment claim.

3      C.     Constructive Discharge

4      Like a hostile-work-environment claim, a claim for constructive discharge usually
5 results from a series of allegedly discriminatory actions on the part of the employer. *Draper*
6 *v. Couer Rochester, Inc.,* 147 F.3d 1104, 1110 (9th Cir. 1998).  For an atmosphere of
7 hostility to be actionable, the offending behavior must be sufficiently severe or pervasive to
8 alter the conditions of the victim's employment and create an abusive working environment.
9 *Meritor,* at 67, 106 S.Ct. at 2399.  However, a hostile-environment/constructive-discharge
10 claim entails slightly more.  *Pa. State Police v. Suders,* 542 U.S. 129, 146-47, 124 S.Ct.
11 2342, 2354 (2004).

12      A plaintiff who advances a hostile-work-environment/constructive-discharge claim
13 must show working conditions that are so intolerable that a reasonable person would have
14 felt compelled to resign.  *Id.*  Thus, a constructive discharge occurs when a person quits his
15 or her job under circumstances in which a reasonable person would feel that the conditions
16 of employment have become intolerable.  *Draper,* 147 F.3d at 1110; *MacLean v. State Dept.*
17 *of Educ.*, 195 Ariz. 235, 245, 986 P.2d 903, 912 (Ct. App. 1999).  This test establishes an
18 objective standard.  *Watson v. Nationwide Ins. Co.,* 823 F.2d 360, 361 (9th Cir. 1987).  The
19 plaintiff need not show that the employer subjectively intended to force the employee to
20 resign.  *Id.*  Harassment so intolerable as to cause a resignation may be effected through
21 co-worker conduct, unofficial supervisory conduct, or official company acts.  *Pa. State*
22 *Police.* at 148, 124 S.Ct. at 2355.

23      The Defendants argue that even assuming the Plaintiff can show the existence of a
24 hostile work environment, he cannot show that the hostile work environment was so abusive
25 that a reasonable person would have felt compelled to resign.  The Defendants point out that
26 the Plaintiff has not provided any evidence that the Defendants were attempting to "get rid
27 of" the Plaintiff.  Is support of their argument, they point to the undisputed fact that the
28

- 12 -

1 Plaintiff was given a raise. The Defendants also allege that they "could" have fired the
2 Defendant due to disputed allegations of fraud against a customer, but didn't.

3 What is relevant to the Plaintiff's claim is not the Defendants subjective intent, but
4 rather whether the Plaintiff resigned under circumstances in which a reasonable person would
5 feel that the conditions of employment had become intolerable. *Draper,* 147 F.3d at 1110;
6 *MacLean,* 195 Ariz. at 245, 986 P.2d at 912. Regardless of whether the Defendants did not
7 subjectively intend to force the Plaintiff to resign, the Plaintiff can set forth a claim of
8 constructive discharge if his working conditions were so intolerable that a reasonable person
9 would have been compelled to resign. *See Watson,* 823 F.2d at 361.

10 The Court will not revisit the facts as it feels that they were amply discussed with
11 respect to the Plaintiff's hostile-work-environment claim. Suffice it to say that the Plaintiff
12 has alleged numerous incidences of offensive, harassing, and discriminatory treatment within
13 his workplace. The determination as to whether these same conditions were so intolerable
14 and discriminatory as to justify a reasonable employee's decision to resign is a factual
15 question that is normally left to the trier of fact. *Pa. State Police.* at 148, 124 S.Ct. at 2355;
16 *MacLean,* 195 Ariz. at 245, 986 P.2d at 912. Although there are some instances where the
17 discrimination alleged is insufficient as a matter of law to support a finding of constructive
18 discharge, this is not such a case. *See Thoman v. Douglas,* 877 F.2d 1428, 1434 (9th Cir.
19 1989) (discussing the similar standards articulated by the 9th Circuit and Arizona courts
20 concerning constructive discharge).

21 The Plaintiff in this case has alleged a continuous pattern of discriminatory treatment
22 that continued, in the presence of supervisors, after the Plaintiff complained about the
23 conduct. The conduct allegedly occurred on a daily basis, and was highly offensive in
24 nature. The Plaintiff has presented evidence of a "'worse case' harassment scenario,
25 harassment ratcheted up to the breaking point." *See, e.g., Pa. State Police,* at 147, 124
26 S.Ct.at 2355. This is the very type of conduct that, if proven, can support a constructive
27 discharge claim. The Court finds that a rational trier of fact could conclude, from the
28 evidence presented, that the Plaintiff's working conditions had become so hostile and

1 intolerable that a reasonable person in the Plaintiff's situation would have been compelled
2 to quit. Therefore, the Plaintiff has succeeded in raising a genuine issue of fact for trial. *See*
3 *Watson,* 823 F.2d at 361; *Thomas,* 877 F.2d at 1434.

4 At oral argument on June 19, 2006, the Defendants argued that even assuming the
5 Plaintiff's work conditions were so hostile and intolerable that a reasonable person would
6 have been compelled to quit, the Plaintiff cannot assert a claim for constructive discharge
7 because he did not in fact quit because of his work environment. In support of their
8 argument, they point to the Plaintiff's resignation letter. The letter does not mention Mr.
9 Secia's conduct and does not state that the Plaintiff is resigning because of his working
10 conditions.

11 The Court agrees that the Plaintiff's constructive discharge claim cannot succeed if
12 the Plaintiff in fact quit for other some reason unrelated to the conditions of his employment
13 and the alleged conduct in this case. *See, e.g., Pa. State Police,* at 148, 124 S.Ct. at 2355 (a
14 constructive discharge involves *both* an employee's decision to leave and the precipitating
15 conduct). However, the Plaintiff was asked at his deposition why he quit, and testified that
16 the reason he quit was because Mr. Secia's conduct continued after he complained and the
17 supervisors did not do anything about it. The Plaintiff also testified about why he did not
18 include this information in his resignation letter. Thus, the Plaintiff has succeeded in raising
19 a question of fact regarding the reason for his resignation that precludes the entry of summary
20 judgment.

21       D.     Vicarious Liability

22 The Defendants argue that JDR cannot be held vicariously liable for a supervisor's
23 remarks. Two Supreme Court cases set forth the test for determining when an employer is
24 vicariously liable for a hostile work environment created by a supervisor. In *Burlington*
25 *Indus. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257 (1998), and *Faragher v. Boca Raton,* 542
26 U.S. 775, 118 S.Ct. 2275 (1998), the Supreme Court held that an employer is subject to
27 vicarious liability for hostile work environment created by a supervisor with immediate or
28 successively higher authority over the employee. To prevent this rule from imposing

- 14 -

automatic liability and to encourage employers to adopt anti-harassment policies, the Court provided employers with an affirmative defense (the "*Ellerth/Faragher*" defense) that they could assert to avoid vicarious liability for supervisor misconduct. *Burrell v. Star Nursery,* 170 F.3d 951, 955 (9th Cir. 1999).

The *Ellerth/Faragher* defense is comprised of two necessary elements: (1) the employer exercised reasonable care to prevent and promptly correct any harassing behavior; and (2) the plaintiff/employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer. *Id.* (quotations omitted). The party asserting the defense bears the burden to allege and prove that the employee failed in that regard. *Pa. State Police,* at 152, 124 S.Ct. at 2357.

The *Ellerth/Faragher* defense focuses on whether the harasser has immediate or successively-higher authority over the victim of the harassment, rather then whether the employer knew about the harassment. *Burrell,* 170 F.3d at 955. Thus, if the harassment is actionable, and the harasser has supervisory authority over the victim, the court presumes that the employer is vicariously liable for the harassment. *Id.* This presumption may be overcome only if the alleged harassment has not culminated in a tangible employment action, and then only if the employer can prove both elements of the affirmative defense. *Id.*

The law is no different with respect to the Plaintiff's claim of constructive discharge. Title VII also encompasses employer liability for a constructive discharge resulting from a hostile work environment. *Pa. State Police,* at 142-43, 124 S.Ct. at 2352. In constructive-discharge cases, the plaintiff who fails to allege a tangible employment action has the duty to mitigate harm. *Id.* at 152, 124 S.Ct. at 2357. However, the employer still bears the burden to allege and prove that the plaintiff failed in that regard. *Id.*

The Court finds that the Defendants are not entitled to summary judgment based on the *Ellerth/Faragher* affirmative defense. The Court has already determined that this case, in its current posture, presents genuine issues of material fact concerning the Plaintiff's hostile-work-environment and constructive-discharge claims. Additionally, the Plaintiff has presented evidence that the hostile work environment was created by Craig Secia. There

does not appear to be any dispute that Mr. Secia had authority, supervisory or successively higher, over his employees. The Plaintiff has presented evidence that raises a question of fact as to whether he was constructively discharged, which would constitute an adverse employment action. *Pa. State Police,* at 140, 124 S.Ct. at 2350 (holding that a constructive discharge precipitated by a supervisor's official act can constitute a "tangible employment action"). Assuming the Plaintiff can prove the existence of a constructive discharge, the *Ellerth/Faragher* defense is not available to the Defendants. *See, e.g, Ellerth,* at 765, 118 S.Ct. at 2270 (employer may not raise the defense to liability if the harassment culminates in a tangible employment action such as an employee's discharge), *Faragher,* at 807-08, 118 S.Ct. at 2293 (same).

Additionally, even assuming that the *Ellerth/Faragher* defense was available to the Defendants, summary judgment would not be proper because the Plaintiff has succeeded in raising a question of fact as to whether the Defendants exercised reasonable care to prevent or promptly correct the offending behavior.

E.   Retaliation

In order to establish a prima facie case of retaliation, the Plaintiff must show that: (1) he was engaged in protected activity; (2) he suffered an adverse employment decision; and (3) there was a causal link between the protected activity and the adverse employment decision. *Brooks v. City of San Mateo,* 229 F.3d 917, 928 (9th Cir. 2000); *Garner v. Motorola,* 95 F.Supp.2d 1069, 1076 (D. Ariz. 2000).

The Defendants argue that the Plaintiff cannot show that the Defendants took any adverse employment action which was linked to a protected activity. The Defendants suggest that the only adverse employment action alleged in this case is the constructive discharge. The Defendants contend that the Plaintiff's Complaint only alleges that he quit because of the hostile work environment, not that he quit because of some action that was taken against him in retaliation for reporting Mr. Secia's conduct. Therefore, the Defendants argue, the Plaintiff has failed to allege a causal connection between the adverse employment

1  action (the constructive discharge) and the protected activity (reporting the discriminatory
2  conduct to Mr. Secia's supervisors).

3  The Plaintiff's response does not address his retaliation claim at all. At Oral
4  Argument on June 19, 2006, the Plaintiff conceded that he did not respond to or contest the
5  Defendants' Motion for Summary Judgment as it applies to the claim of retaliation.

6  As noted previously, as the party opposing summary judgment, the Plaintiff cannot
7  merely rely on the allegations in his Complaint. He must produce some significant probative
8  evidence tending to contradict the Defendants' allegations and thereby creating a material
9  question of fact. *See, e.g., Anderson,* at 256-57, 106 S.Ct. at 2513-14 (holding that the
10 plaintiff must present affirmative evidence in order to defeat a properly supported motion for
11 summary judgment). Accordingly, the Defendants' Motion for Summary Judgment is
12 granted with respect to the Plaintiff's claim of retaliation.
13 / / /

Consistent with the above opinion,

IT IS ORDERED GRANTING IN PART AND DENYING IN PART the Defendants' Motion for Summary Judgment (doc. 19).

DATED this 27th day of June, 2006.

_____
James A. Teilborg
United States District Judge

- 18 -